## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**LARRY WAYNE CANTRELL,**

   **Plaintiff,**

**v.**                                    **Case No. 2:14-cv-17419**

**JIM RUBENSTEIN, DAVID BALLARD,**
**JOHN FRAME, DANIEL HAHN,**
**MARK PLUMLEY, RICHARD MILLER,**
**JOHN EMBRESCIA, and JASON RHODES,**

   **Defendants.**

### PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and it is referred to the undersigned for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court is the defendants' Motion for Summary Judgment (ECF No. 96).

### PROCEDURAL HISTORY

The plaintiff, Larry Wayne Cantrell ("Cantrell"), is an inmate, now incarcerated at the Northern Correctional Center ("NCC"), in Moundsville West Virginia, serving a life sentence for first degree murder and a consecutive 20-year sentence for attempted armed robbery. (*See* Pl. Dep. Tr., ECF No. 96, Ex. A at 19). He is eligible for parole in 2024. (*Id.*)

### *The plaintiff's verified Complaint and evidence provided therewith*

On June 3, 2014, Cantrell filed a verified Complaint under 42 U.S.C. § 1983 alleging that his right to be free from cruel and unusual punishment under the Eighth Amendment

was violated by the defendants when he was pepper sprayed in his segregation cell at the Mount Olive Correctional Complex ("MOCC") and subsequently placed in a restraint chair. Cantrell named the following defendants in the Complaint: Jim Rubenstein, Commissioner of the West Virginia Division of Corrections; David Ballard, Warden, MOCC; John Frame, Associate Warden of Security; Daniel Hahn, Lieutenant[1]; Mark Plumley, Sergeant; Richard Miller, C.O. II; John Embrescia, C.O. II; and Jason Rhodes, C.O. II, each sued in his individual capacity. Cantrell seeks a declaration that the acts or omissions of the defendants violated his rights under the Constitution of the United States, monetary damages, and other just and equitable relief as the court deems necessary.

Specifically, Cantrell alleges that, on the evening of March 16, 2014, while housed in Pod 6, Cell 612 in the Quilliams II segregation unit at MOCC, he pressed his emergency call button for 30 minutes in order to get medical attention for another inmate, Samuel Ramsey, who was housed in the cell next door. (ECF No. 2 at 5, ¶ 1). Cantrell further alleges that several inmates began kicking their doors to get the attention of the correctional officers. (*Id.*, ¶ 2).

Cantrell further alleges that defendants Plumley and Miller entered the pod and ran straight upstairs, by-passing several inmates who were actively kicking their doors, and came to his cell door, at which time Plumley dropped his food slot ("bean hole") and Miller immediately sprayed Cantrell with an "entire can" of oleoresin capsicum ("OC spray" or "pepper spray") in the face and torso. (*Id.*, ¶¶ 3-4). Cantrell asked why he had been sprayed and requested to speak to the shift supervisor. (*Id.*, ¶ 5). Cantrell alleges

---

[1] According to the defendants' Memorandum of Law, at the time of these incidents, defendant Hahn held the position of Assistant Security Support Commander. (ECF No. 97 at 2 n.1).

that defendant Plumley laughed and stated "you kicked your door, now sit on your bunk." (*Id.*, ¶ 6).  Plumley allegedly continued to taunt Cantrell about being pepper sprayed and Miller was behind him laughing.  (*Id.* at 6, ¶ 7).[2]  Cantrell further alleges that, throughout this time, inmate Ramsey was actively kicking his door and asking for medical attention. (*Id.*, ¶ 8).

At that point, defendants Rhodes and Embrescia entered the pod and Cantrell was pleading with them to get the shift supervisor because he was in severe pain.  (*Id.*, ¶ 9). Embrescia was carrying a large can of "Mark IX Red Phantom Cell Buster" (OC spray). Cantrell alleges that he yelled, "I'm on my bunk, I'm on my bunk."  (*Id.*, ¶ 10). Nevertheless, he contends that Plumley ordered Embrescia to deploy the Phantom into his cell, even though he was complying with orders.  (*Id.*, ¶ 11).  He further contends that Embrescia deployed a 10-second burst of Phantom under the door of his cell and that Rhodes and Miller did nothing to intervene or to contact the shift supervisor.  (*Id.* at 6-7, ¶¶ 12-13).

Cantrell alleges that he suffered burning and extreme pain on his face and body and that he suffered a panic attack and could not breathe, noting that he had previously suffered from a collapsed lung.  (*Id.*, ¶¶ 14-15).  Cantrell contends that he immediately begged for help and offered to "cuff up" in order to be removed from his cell.  (*Id.*, ¶ 16). However, he was left in his cell for 25-35 minutes before being escorted to the multi-purpose room where he was decontaminated and received medical treatment for his injuries.  (*Id.*, ¶¶ 17-18).

---

[2] Specifically, Cantrell asserts that Plumley said "Ahout, Ahout, what's wrong with your face?  Burns, don't it?"

Cantrell further alleges that defendant Hahn arrived and Cantrell attempted to explain to him that his door always shows as insecure, and Hahn said he would look into it. (*Id.* at 8, ¶ 19). Cantrell was then escorted back to his cell by Plumley and Miller. He contends that he was placed in the shower with no soap or other cleaning supplies to remove the chemical agents from his skin and was subsequently placed back in his cell without it having been decontaminated and was again given no cleaning supplies. (*Id.*, ¶¶ 20-23).

Cantrell further alleges that, after several hours of suffering from the effects of the chemical agents, he and several other inmates began flushing their toilets to flood their cells and the pod. (*Id.* at 8-9, ¶ 24). At that time, Miller and Embrescia entered the pod and shut off the water to Cantrell's cell. (*Id.*, ¶ 25). Cantrell states he was strip-searched and placed in mechanical restraints, without resistance, by Plumley and Embrescia. (*Id.*, ¶ 26).

Cantrell was again escorted to the multi-purpose room, where Hahn ordered that he be placed in the restraint chair, allegedly without letting him use the restroom first. (*Id.*, ¶ 27). Cantrell further alleges that he repeatedly asked to use the restroom and was continually told that he would have to wait 30 minutes before he could go. (*Id.* at 9-10, ¶¶ 28-30). After several pleas to both Embrescia and Plumley to use the restroom, Cantrell urinated on himself. (*Id.*, ¶¶ 31). Hahn was contacted and he ordered that Cantrell be released from the chair. (*Id.*, ¶¶ 32-33). Cantrell claims that he was placed back into his cell with no bed clothes and little clothing for the rest of the night. (*Id.*, ¶ 34).

Cantrell further alleges that he unsuccessfully filed several grievances concerning these events, and sent a request to Segregation Commander Captain Caudill (who is not

4

a defendant herein) to contact maintenance about his cell door registering as insecure. (*Id.* at 10-11, ¶¶ 35-38). Cantrell received two disciplinary violation reports regarding this incident: one for tampering with locks and/or doors and one for creating a disturbance. (*Id.,* ¶ 39). He pled guilty to creating a disturbance.[3] (*Id.* at 11-12, ¶ 40). The Complaint further states that the hearing officer dismissed the tampering with locks charge, after testimony from C.O. II Homer Baxter confirmed that the security light in the control tower for Cantrell's cell always shows insecure, as documented in the tower log book. (*Id.* at 12, ¶¶ 43-44). According to Cantrell, Baxter's testimony also confirmed that several inmates throughout Pod 6 were kicking their cell doors and that Plumley and Miller by-passed those inmates' cells and went straight to Cantrell's cell. (*Id.*, ¶¶ 41-42).

Cantrell further alleges that:

After this incident occurred, the policy for night shift using "chemical agents" was changed. Only night shift, which defendants Hahn, Plumley, Miller, Rhodes and Embrescia work on, must get a Lieutenant or Captain before they are allowed to use "chemical agents."

(*Id.* at 13, ¶ 45). Cantrell maintains that he was never a threat to himself or others and was compliant at all times and, therefore, should not have been placed in the restraint chair and forced to urinate on himself. (*Id.* at 14, ¶ 49). He further asserts that the defendants acted wantonly, maliciously and willfully. (*Id.*, ¶ 51).

Cantrell asserts that defendants Miller and Embrescia violated his Eighth Amendment rights by spraying him with chemical agents without giving a reason for the use of force and when he was allegedly being compliant, and that Plumley violated his Eighth Amendment rights by "using his authority" to order Miller and Embrescia to

---

[3] The violation report indicates that the creating a disturbance charge arose out of Cantrell's flooding of his cell, not the earlier alleged door-kicking. (ECF No. 2, Ex. H).

deploy the chemical agents.   (*Id.* at 16-17, ¶¶ 56-57, 59-60).   Cantrell further contends that defendant Rhodes violated his Eighth Amendment rights by failing to intervene to stop the second use of chemical agents or to call the shift supervisor.[4]  (*Id.* at 17, ¶ 61).  He further contends that these four defendants violated his Eighth Amendment rights by leaving him in his cell for 25-35 minutes after being sprayed.  (*Id.*, at 17, ¶ 58).

Cantrell further alleges that defendants Hahn, Plumley and Embrescia violated his Eighth Amendment rights by placing him in the restraint chair for punishment (*id.* at 16, ¶ 55), and that defendants Plumley, Embrescia, Rhodes and Miller violated his Eighth Amendment rights by not contacting defendant Hahn and informing him that the plaintiff needed to use the restroom until after the plaintiff had urinated on himself.  (*Id.* at 18, ¶ 62).

Cantrell further alleges that defendants Rubenstein, Ballard and Frame should be held liable under the Eighth Amendment because, as supervisors, they sanctioned policies allowing inmates at MOCC to be placed in the restraint chair for punishment, even when the inmate is not a danger to himself or others, is being compliant, and when less restrictive measures could resolve the situation.  (*Id.* at 15, ¶ 53).  He further alleges that those defendants, along with defendant Hahn, allowed the training of officers to use chemical agents on compliant inmates whom they only "suspect" of committing a rule violation.  (*Id.*, ¶ 54).

Cantrell attached the following exhibits to his initial Complaint:  (A) an affidavit of inmate Samuel Ramsey concerning the events in Pod 6 on March 16, 2014; (2A) an affidavit of inmate Steven Denkenberger concerning the events in Pod 6 on March 16,

---

[4]  Based upon the allegations in paragraph 13, the undersigned believes that this failure to intervene claim may also be alleged against defendant Miller.  (ECF No. 2 at 7, ¶ 13).

2014; (3A) an affidavit of inmate Joshua Menendez-Finch concerning the events in Pod 6 on March 16, 2014; (B) Cantrell's medical progress notes from 2-8-14 to 3-16-14; (C) a March 17, 2014 inmate grievance concerning Cantrell's placement in the restraint chair and the refusal to let him use the restroom; (D) a March 17, 2014 inmate grievance concerning alleged verbal harassment of Cantrell by defendant Plumley after the first deployment of chemical agents on March 16, 2014; (E) a March 17, 2014 inmate grievance about the events surrounding the first use of chemical agents on Cantrell on March 16, 2014; (F) a March 17, 2014 unit team request form requesting that maintenance fix the alarm on Cantrell's cell door; (G) Cantrell's violation report for tampering with locks and/or doors filed by defendant Plumley; and (H) Cantrell's violation report for creating a disturbance filed by defendant Plumley.  (ECF No. 2, Attach. 1, Exs. A-H).

*The defendants' Motion for Summary Judgment and evidence in support*

Following a period of time for discovery, on December 9, 2015, the defendants filed a Motion for Summary Judgment (ECF No. 96) and a Memorandum of Law in support thereof (ECF No. 97), asserting that Cantrell's Eighth Amendment claims against each of the defendants fail as a matter of law and that the defendants are entitled to qualified immunity.  In support of their motion, the defendants submitted excerpts from Cantrell's deposition (ECF No. 96, Ex. A); training records for various defendants (*id.*, Ex. B); a memo from Lieutenant Daniel Hahn to Major Robert Rhodes dated March 16, 2014, summarizing the circumstances surrounding the deployment of chemical agents against Cantrell on that date, and including the incident reports of each of the officers or other staff who were involved (*id.*, Ex. C); and the Intensive Supervision Log from Cantrell's placement in the restraint chair on March 17, 2014, along with a memo from Lieutenant Daniel Hahn to Major Robert Rhodes summarizing that use of force (*id.*, Ex. D).

However, the defendants did not submit any affidavits or other sworn evidence.  The defendants' version of the material facts is as follows:

On the evening of March 16, 2014, several inmates in the Quilliams II unit began kicking their doors and creating a disturbance.  (ECF No. 96, Ex. A at 23; Incident Reports, ECF No. 96, Ex. C).  Cantrell's Door Positioning Sensor Light on the prison tower control board was flashing, indicating movement of the door and identifying Cantrell as a potential participant in the disturbance.  (*Id.*, Ex. C at 1-2).  Defendant Miller's incident report asserts that when he and Plumley entered Pod 6, they witnessed "cell door 612 [Cantrell's cell door] being kicked so hard that the door appeared that it was going to fall off its hinges."  (*Id.*, Ex. C at 4).

The defendants further assert that, when Plumley and Miller arrived at his door, Plumley gave Cantrell "several loud clear commands . . . to shut up and sit on his bunk . . ." but Cantrell was uncooperative and using obscenities.   (*Id.*, Ex. C at 2, 4 and 8).  Thus, at Plumley's direction, Miller attempted to spray Cantrell with two one-second bursts from an issued can of Mark IX (also referred to as "Mark 9" or "MK-9") OC spray through the food slot of his cell door.  (*Id.*, Ex. A at 23; Ex. C at 2, 4 and 8).  However, Miller and Plumley both contend that the first can of OC spray malfunctioned and "the stream from the Mark 9 was not strong enough to deliver the [OC] and was only barely able to hit him in his waste [sic; waist] and legs."  (*Id.*, Ex. C at 4 and 8).  Miller then radioed for assistance.  (*Id.* at 4).

Hearing calls for assistance over the radio, defendant Embrescia retrieved a larger can of pepper spray known as "Phantom" from the equipment locker and went to Cantrell's cell, along with defendants Rhodes, where, upon Plumley's instruction, he allegedly deployed two one-second bursts of Phantom under the cell door, which resulted

in Cantrell's compliance.  (*Id.*, Ex. C at 3).  Embrescia and Rhodes' incident reports further state that they witnessed Cantrell actively kicking his door and yelling obscenities at the other officers, and that he refused multiple orders from Plumley to comply.  (*Id.* at 3 and 5).  According to the defendants' Memorandum of Law and the incident report of C.O. II Homer Baxter, two other inmates housed in cells on Pod 6 were also sprayed with pepper spray that night.  (ECF No. 97 at 3 and Ex. C at 10).

The defendants further contend that, after order was restored to the unit, Cantrell was removed from his cell and taken to the multi-purpose room for decontamination. (*Id.*, Ex. A at 37-39; Ex. C at 3-5).  He was subsequently given a shower, while defendants Embrescia and Rhodes decontaminated his cell.  (*Id.*)

The defendants further assert that Cantrell's disruptive conduct continued into the early morning hours of March 17, 2014, when he and several other inmates flooded their cells by stopping up their toilets.  Upon the order of defendant Hahn, Cantrell was taken to the multi-purpose room and placed in a restraint chair, where he was held for one hour and fifty-five minutes.  At that time, Hahn deemed Cantrell to be compliant and ordered that he be released from the restraint chair.  He was checked by a nurse with no injuries found.  (ECF No. 96, Ex. A at 58-60 and Ex. D, Intensive Supervision Log).  The defendants' evidence does not mention whether Cantrell urinated on himself while restrained.

### *The plaintiff's Response to the Motion for Summary Judgment*

Pursuant to the holding in *Roseboro v. Garrison*, 529 F.2d 309 (4th Cir. 1975), Cantrell was previously advised of his right and obligation to file a response to any dispositive motion filed by the defendants.  (ECF No. 61 at 5-6).  On December 17, 2015, Cantrell filed a Response to the Motion for Summary Judgment, with numerous exhibits.

(ECF No. 98).  His lengthy response largely repeats his factual contentions and asserts that there are genuine issues of material fact concerning whether each use of force constituted cruel and unusual punishment.  He also contends that there are genuine issues of material fact concerning the supervisory defendants' actual or constructive knowledge of a pervasive and unreasonable risk of harm to him and whether they tacitly authorized the conduct of the defendants.  Cantrell's Response further asserts that the defendants are not entitled to qualified immunity on his claims.  The undersigned will address these arguments in detail *infra*.

With his Response, Cantrell re-submitted Exhibits A-F that were attached to his Complaint (ECF No. 98, Exs. A-F).  He also attached the following additional exhibits, some of which are copies of exhibits also offered by the defendants: (G) a copy of an incident report prepared by Jason Rhodes concerning the deployment of Phantom into Cantrell's cell and his decontamination process on March 16, 2014; (H) a copy of the training records of Jason Rhodes for the period of January 6, 2013-February 13, 2014; (I) a copy of the job description for a Correctional Officer 2; (J) a copy of West Virginia Division of Corrections Policy Directive 313.04 concerning "Restrictions on the Use of Physical Force;" (K) a copy of West Virginia Division of Corrections Policy Directive 312.02 concerning "Less-Lethal Use of Force;" (a second exhibit (K)) a copy of an incident report prepared by Jason Rhodes concerning the placement of Cantrell in the restraint chair on March 17, 2014; (L) an incident report prepared by John Embrescia concerning the placement of Cantrell in the restraint chair on March 17, 2014; (M) an incident report prepared by Mark Plumley concerning Cantrell's flooding of his cell on March 17, 2014 and being charged with creating a disturbance; (N) MOCC Intensive Supervision Activity Log for Cantrell on March 17, 2014; (O) a copy of the job description for a Correctional

Officer 4; (Exhibit Disc 1)[5] – a copy of an evidence/property seizure receipt for a compact disc of a disciplinary hearing seized from Cantrell on October 7, 2015; (P) a copy of Defendants' Responses to Plaintiff's Fifth Request for Production of Documents which provided Cantrell with a DVD of his April 10, 2014 disciplinary hearing for tampering with locks and/or doors on March 16, 2014 and a response indicating that the tampering charge was dismissed; (Q) an incident report prepared by Homer Baxter concerning the disturbance in Pod 6 and the deployment of MK-9 and Phantom into the cells of Larry Cantrell, Dustin Heffner and Joshua Finch on March 16, 2014; (R) a copy of an incident report prepared by Mark Plumley concerning the deployment of MK-9 and Phantom into Cantrell's cell and his decontamination process on March 16, 2014; (S) a copy of an incident report prepared by Richard Miller concerning the deployment of MK-9 and Phantom into Cantrell's cell and his decontamination process on March 16, 2014; (T) a copy of an incident report prepared by Mark Plumley concerning Cantrell kicking his door on March 16, 2014 and being charged with tampering with locks and/or doors; (U) a copy of an incident report prepared by John Embrescia concerning the deployment of Phantom into Cantrell's cell on March 16, 2014; (V) a copy of Plaintiff's First Requests for Admissions to Defendants Plumley, Miller, Rhodes and Embrescia[6]; (W) this appears to

---

[5]  With regard to "Exhibit Disc 1" and "Exhibit Disc 2," Cantrell did not file the discs containing the actual audio or video recordings, but rather sent the prison's property seizure reports concerning the seizure of this evidence by prison officials, appearing to indicate that he is not in possession of these discs; however, they should have been placed with his personal property in the State Shop.  Thus, Cantrell should have requested that the discs be sent to the court for review.  Accordingly, this evidence is not in a form which the court can review as part of the present summary judgment record.

[6]  Cantrell's Response to the Motion for Summary Judgment makes several assertions that he served the Requests for Admissions located in Exhibits V, DD and NN on the defendants' counsel on July 31, 2015, and that the defendants never responded to these requests.  (ECF No. 98 at 15, 24 and 44).  A certificate of service concerning Cantrell's alleged service of these Requests for Admissions appears on the docket sheet at ECF No. 64, filed on August 3, 2015.  There are no certificates of service concerning the defendants' responses to Requests for Admissions anywhere on the docket sheet and the defendants have filed no response disputing Cantrell's contention that he served these requests and that they were unanswered.

be a copy of the daily log for Pod 6 for March 16, 2014; (Exhibit Disc 2) – a copy of an evidence/property seizure receipt for a DVD+R seized from Cantrell on May 29, 2015 and placed in an evidence locker; (X) a copy of an incident report prepared by Mark Plumley concerning inmate Dustin Heffner (Cell 608) kicking his cell door on March 16, 2014 and being charged with tampering with locks and/or doors; (Y) a copy of an incident report prepared by Mark Plumley concerning the deployment of MK-9 Phantom into inmate Dustin Heffner's cell (Cell 608) and his decontamination process on March 16, 2014; (Z) a copy of an incident report prepared by Mark Plumley concerning the deployment of MK-9 Phantom into inmate Joshua Menendez-Finch's cell (Cell 610) and his decontamination process on March 16, 2014; (AA) a copy of an excerpt from the Standards for Adult Correctional Institutions on Use of Restraints; (BB) a copy of the MOCC Intensive Supervision Log for Cantrell's placement in the restraint chair on March 17, 2014; (CC) a copy of the job description for a Correctional Officer 5; (DD) a copy of Plaintiff's First Requests for Admissions to Defendant Hahn; (EE) a copy of the Product Overview and Material Safety Data Sheet (MSDS) for Sabre Red Phantom; (FF) a copy of the label from a can of "Phantom OC" by Sabre (which is largely illegible); (GG) a copy of the WVDOC "OC Aerosol Instructor" certificate for Daniel Hahn indicating that he completed a six hour instructor course on September 24, 2012; (HH) a copy of the "Less-Lethal Training" records for Mark Plumley on January 14, 2014; (II) a copy of the "OC Training" records for John Embrescia on October 15, 2013; (JJ) a copy of the "OC Recert Instructor" training records for David Miller on July 13, 2012; (KK) a copy of the job description for Corrections Warden; (LL) a copy of inmate Roger Smith's "Unit Team Request Form

---

Accordingly, it appears to be undisputed that these Requests for Admissions were not answered and may be deemed admitted, pursuant to Rule 36(a)(3) of the Federal Rules of Civil Procedure.

Quilliams 2" dated August 6, 2013, stating "Per Warden, Martial Law is a condition that MOCC utilizes"; (MM) a copy of inmate Andre Wilson's grievance dated July 15, 2013 asking "to stop being threatened with mace" and asserting that correctional officers had told him "Paul Perry told us it's martial law around here, we are to pepper spray an inmate for the slightest infraction . . . ." and receiving a response from defendant Hahn stating "There are specific policys [sic; policies] in Q2 that must be followed.  All uses of force are reviewed but I will look into this for you and take appropriate action"; (NN) a copy of Plaintiff's First Requests for Admission to Defendants Ballard and Frame; (OO) a copy of an e-mail from Robert E. Rhodes to Brian R. Penick dated September 9, 2013, concerning "protocol" and stating "[w]e do not have to give efforts to temper to those locked up in our Seg units . . . ." and "once again the habit of not using the chair in connection to uses of force is being practiced . . . generally speaking the inmate will be restrained in the chair in conjunction with needed uses of force"; (PP) a copy of a grievance filed by inmate Casey Rygh on August 18, 2012 concerning his placement in a restraint chair; (QQ) a copy of the Use of Force Review Committee Report concerning the use of chemical agents on Cantrell on March 16, 2014; (RR) a copy of the Use of Force Review Committee Report concerning the use of chemical agents on inmate Joshua Menendez-Finch on March 16, 2014; (SS) a copy of the Use of Force Review Committee Report concerning the use of chemical agents on inmate Dustin Heffner on March 16, 2014; (TT) a copy of a written summary of the defendants' employment history; and (UU) a copy of MOCC Operational Procedure #1.05 concerning Inmate Accessibility to Policies and Procedures dated July 1, 2011.  (ECF No. 98, Exs. G-UU).

*The defendants' Reply brief and the unauthorized sur-replies of both parties*

On January 22, 2016, the defendants filed a Reply (ECF No. 99), asserting that Cantrell has pled only conclusory allegations and offered inadmissible evidence that cannot establish any material dispute of facts to support the liability of the various individual defendants.   Subsequently, Cantrell filed an unauthorized "Supplemental Response" (ECF No. 102) and the defendant's filed an unauthorized "Supplemental Reply" (ECF No. 104).  The undersigned will address these documents as necessary *infra*. This matter is ripe for adjudication.

## STANDARD OF REVIEW

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010).  Material facts are those necessary to establish the elements of a party's cause of action.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  *Id.*  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where

the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Subsection (c)(2) of the rule provides that a party may object that the material cited by an opposing party cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2).

Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may: (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and undisputed supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence, or make determinations of credibility. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the

underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

### EVIDENTIARY ISSUES

Before addressing the merits of each of Cantrell's claims, the undersigned finds it necessary to address the defendants' general contention made throughout their briefs that Cantrell may not rely upon his own self-serving allegations to overcome summary judgment and that he has offered no other evidence to corroborate his self-serving testimony.  Relying upon prior Fourth Circuit precedent, the presiding District Judge has previously ruled that allegations contained in a verified complaint filed by a *pro se* litigant may be sufficient to rebut a summary judgment motion.  *See Humple v. Hilewitz*, No. 2:13-cv-14618, 2016 WL 1117600, at *2 (S.D. W. Va. Mar. 22, 2016) (citing *Williams v. Griffin*, 925 F.2d 820, 823 (4th Cir. 1991) ("a *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge.")  In accordance with Judge Johnston's prior rulings to the same effect, Cantrell's Complaint is considered to be verified in light of his declaration under penalty of perjury that the allegations in his Complaint are true and correct.  (ECF No. 2 at 21).

Moreover, as will be addressed in greater detail *infra*, Cantrell relies upon evidence other than his own allegations, including affidavits of other inmates who were present at the time of these incidents and, thus, have personal knowledge of those events, incident reports and grievances containing statements allegedly made by the defendants and

16

others indicating the existence of a policy permitting the use of force at times that it may not be warranted, and prison policy directives addressing the types of force used by the defendants on the plaintiff.  The credibility of such evidence is not a matter that this court may consider on summary judgment.  At present, this court may only consider whether the plaintiff has presented evidence that creates a genuine issue of material fact that should be determined by a jury.

The defendants assert for the first time in their Reply brief that documentation offered by Cantrell, particularly that offered to support his supervisory liability claims, is inadmissible hearsay that cannot be considered on summary judgment.  (ECF No. 99 at 3-4).  In light of this assertion, the undersigned will briefly address the standards for admissibility of evidence submitted on summary judgment and the application of such authority to the evidence offered by both Cantrell and the defendants.

Rule 56 of the Federal Rules of Civil Procedure was amended in 2010.  "[T]he new rule eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated." *Ridgell v. Astrue*, No. DKC-10-3280, 2012 WL 707008 (D. Md. Mar. 2, 2012); *accord Humphreys & Partners Architects, LP v. Lessard Design Inc.*, 790 F.3d 532, 539 n.4 (4th Cir. 2015).   As addressed above, Rule 56(c) governs the types of evidence that may be considered in support of or in opposition to a motion for summary judgment and the procedures for consideration thereof.  *See* Fed. R. Civ. P. 56(c).

Rule 56(c)(2) states that "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "While a party may support its position on summary judgment by citing to almost any material in the record, the party's reliance on that material may be

defeated if 'the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" *Whitaker v. Morgan State Univ.*, 524 F. App'x 58, 60 (4th Cir. 2013) (quoting Rule 56(c)(2)); *see also Williams v. Silver Spring Vol. Fire Dep't.*, 86 F. Supp.3d 398, 407 (D. Md. 2015).  As recently noted by a South Carolina District Court:

> Rule 56(c) now provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Thus, "facts in support of or opposition to a motion for summary judgment need not be in admissible form; the new requirement is that the party identifies facts that could be put in admissible form."  [*Grimes v. Merritt*, 2015 WL 5158722, at *4 (D. Md. Aug. 31, 2015)] (quoting *Wake v. Nat'l R.R. Passenger Corp.*, 2013 WL 5423978 at *1 (D. Md. Sept. 26, 2013)).  When a party's evidentiary support is challenged on the grounds of admissibility, the party bears the burden of "either authenticat[ing] the documents or propos[ing] a method to do so at trial."  *Id.* (quoting *Forward Magazine, Inc. v. OverDrive, Inc.*, 2011 WL 5169384, at *2 (W.D. Mich., Oct. 31, 2011)).  Thus, "the objection [now] contemplated by the amended Rule is not that material "has not" been submitted in admissible form, but that it "cannot be."  *Rivers v. Burnette*, No. 4:13-cv-01914, 2015 WL 535623, at *8 n.2 (D.S.C. Feb. 10, 2015) (quoting *Kobe v. Haley*, No. 3:11-cv-1146, 2013 WL 4067921, at *6 (D.S.C. Aug. 12, 2013)).
>
> To establish that evidence is authentic, a proponent need only present "evidence sufficient to support a finding that the matter in question is what the proponent claims."  *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) (quoting Fed. R. Evid. 901(a)).  "The burden to authenticate under Rule 901 is not high-only a *prima facie* showing is required."  *Id.*  "The district court's role is to serve as a gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic."  *Id.*  Rule 901(b)(1) explicitly provides that a document may be authenticated by "testimony of a witness with knowledge" and affidavits have long been recognized as a "permissible form of authentication at summary judgment."  *Tillery v. Borden*, 2010 WL 2132226 at *4 (D. Md. May 25, 2010).[7]

*Pronin v. Vining*, No. 5:13-cv-03423-DCN, 2016 WL 1253182, at *4-5 (D.S.C. Mar. 31, 2016).

---

[7]  The undersigned notes that, presently, none of the documentary evidence offered by Cantrell or the defendants has been authenticated through an accompanying affidavit addressing the Rule 901 standard.

In addition to being authenticated, documentary evidence may not contain inadmissible hearsay. *Maryland Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246 (4th Cir. 1991) (noting that "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment"). It is on this basis that the defendants have objected to the consideration of Cantrell's documentation, particularly his reliance on inmate grievances and lawsuits and other documentation proffered to establish a widespread practice of constitutional violations by correctional officers at MOCC and the tacit authorization thereof by the named supervisors. "[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, No. 13-17382, 2016 WL 3770484, * 8 (9th Cir. July 14, 2016). Thus, it appears that an assessment of the probable admissibility of the evidence offered by the parties is necessary.

One notable exception to the trial admissibility rule is an affidavit or its equivalent. Although affidavits would generally not be admissible at trial, they may be offered in support of or in opposition to a summary judgment motion if they set forth facts that would be admissible under the Federal Rules of Evidence. *Goguen ex rel. Estate of Gogeun v. Textron, Inc.*, 234 F.R.D. 13 (D. Mass. 2006). In the instant matter, Cantrell has submitted the affidavits of three other inmates on his pod offering their alleged personal knowledge as eye or ear witnesses to the events surrounding Cantrell being pepper sprayed. If this matter went to trial, those inmates could be called as witnesses to offer their testimony before the jury. The defendants have not objected to the admissibility of these affidavits and the undersigned believes that they are appropriate materials for consideration on summary judgment.

A court may admit evidence, including statements made by someone other than the declarant if it is not offered for the truth of the matter asserted and is otherwise relevant.  *See, e.g., Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 173 n.18 (1988); *see also United States v. Williams*, 445 F.3d 724, 736 (4th Cir. 2006).  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  However, the hearsay rule contains some notable exclusions and exceptions.  For example, statements or admissions by a party opponent are not considered hearsay and may be considered on summary judgment.  *See* Fed. R. Evid. 801(d)(2); Fed. R. Civ. P. 56(c)(1)(A).

Based upon the alleged failure of the defendants to timely respond to Cantrell's First Requests for Admissions, it appears that the defendants are deemed to have admitted the following:

As to all of the defendants other than Rubenstein:

1. At the time of the incidents involving the plaintiff on March 16 and March 17, 2014, COs were instructed not to temper the severity of force used on inmates in the segregation units.

2. At the time of the incidents involving the plaintiff on March 16 and March 17, 2014, the term "Marshal Law" was being used by staff as a condition being utilized on the Quilliams units at MOCC.

(ECF No. 98, Exs. V, DD and NN).  Additionally, as to defendants Plumley, Miller, Rhodes and Embrescia:

1. Plaintiff was sitting on his bunk when "Phantom" was deployed into his cell on March 16, 2014.

2. Plaintiff was not allowed to use the restroom before being placed in the restraint chair on March 17, 2014.

3. Plaintiff asked several times to use the restroom while in the restraint chair on March 17, 2014.

(*Id.*, Ex. V).  And, finally, as to defendants Plumley, Miller, Rhodes, Embrecsia and Hahn:

> 1.      Plaintiff urinated on himself while in the restraint chair on March 17, 2014.

(*Id.*, Exs. V and DD).

Another exception to hearsay are records of a regularly conducted activity (also known as "business records"), as addressed in Rule 803(6) of the Federal Rules of Evidence.  The undersigned believes that the defendants' incident reports and the Use of Force Review Committee Reports, along with the Intensive Supervision Activity Log documents concerning Cantrell's placement in the restraint chair, would likely meet the criteria for admission as business records under Rule 803(6) if properly presented at trial.

Thus, for the purpose of ruling on the defendants' Motion for Summary Judgment, even if all other documentary evidence offered by the parties is determined to be unauthenticated or inadmissible, the undersigned believes that it is appropriate for this court to rely on the following materials:  Cantrell's verified allegations in the Complaint (ECF No. 2); excerpts from Cantrell's deposition (ECF No. 96, Ex. A); the defendants' incident reports, which, although presently unauthenticated, would likely be admissible at trial as statements of a party opponent under Rule 801(d)(2)(A) or as business records under Rule 803(6) of the Federal Rules of Evidence; the Intensive Supervision Activity Log and the Use of Force Review Committee Reports, which could be admissible as business records; the affidavits of Samuel Ramsey, Steven Denkenberger and Joshua Menendez-Finch; and the defendants' admissions addressed above.

Using this evidence[8], the undersigned will first address the claims against the individual correctional officers and will then turn to the claims against the supervisory defendants.[9]  The undersigned believes that such analysis is also necessary before any analysis of the defendants' qualified immunity claims may be addressed.

## ANALYSIS

Section 1983 of Title 42 of the United States Code provides in pertinent part that:

> Every person who under color of any statute, ordinance, regulation, custom or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 is not, in and of itself, a source of substantive rights; rather, it merely provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  Thus, a plaintiff must allege both a violation of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed by a person acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011).  Cantrell's Complaint asserts that the conduct of each of the defendants, all of whom were employees of the West Virginia Division of Corrections at the time of these

---

[8]  Although the undersigned's analysis and proposed findings will be based upon this limited evidence, the undersigned will nonetheless present the complete arguments made by Cantrell and counsel in their briefs, including discussion of evidence not relied on by the undersigned, so that the presiding District Judge receives a complete explanation of the parties' positions.

[9]  If the court finds no constitutional violations by the individual defendants involved in these uses of force, then it will be unnecessary to address the supervisory liability claims, as such claims are predicated on the establishment of the violation of the plaintiff's constitutional rights by a subordinate.

incidents and thus were acting under color of state law, violated his right to be free from cruel and unusual punishment, as guaranteed by the Eighth Amendment to the United States Constitution.

>A.      **Cantrell's Eighth Amendment claims.**

In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  This is a low standard.  The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'"  *Id.* at 833.

"An inmate's Eighth Amendment claim involves a subjective component and an objective component."  *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008); *see also Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996) ("Determination of whether the Eighth Amendment has been violated requires analysis of subjective and objective components.") (citing *Wilson v. Seiter*, 501 U.S. 294, 302 (1991))).  "Specifically, Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)."  *Williams*, 77 F.3d at 761.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.  "The objective component focuses not on the severity of any injuries inflicted, but rather on 'the nature of the force' which

must be 'nontrivial.'" *Tedder v. Johnson*, 527 F. App'x 269, 272 (4th Cir. 2013) (quoting *Wilkins v. Gaddy*, 559 U.S. 34 (2010)).  Under the subjective component, "the state of mind required in excessive force claims is 'wantonness in the infliction of pain.'"  *Iko*, 535 F.3d at 239 (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)).

When prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Whitley*, 475 U.S. at 320-21; *Wilkins*, 559 U.S. at 37.  The Court has identified four factors that must be weighed in making this determination: (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the threat reasonably perceived by the responsible official; and (4) any efforts made to temper the severity of a forceful response.  *Whitley*, 475 U.S. at 321; *Williams*, 77 F.3d at 762.  The *Whitley* Court noted that:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320.  The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547).  Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the

jury." *Id.* at 322.  The undersigned will address each use of force against Cantrell under the *Whitley* factors.

### Deployment of pepper spray by defendants Miller and Embrescia

The defendants' Memorandum of Law in support of their Motion for Summary Judgment asserts that, in order to determine whether a particular use of force was excessive, the court must determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  (ECF No. 97 at 17).  The defendants further emphasize that a reviewing court should not weigh the reasonableness of the officer's conduct with "20/20 hindsight" but must judge the conduct "from the perspective of a reasonable officer on the scene."  (*Id.*)

Turning first to the subjective component, although their briefs do not specifically address the *Whitley* factors, the defendants assert that the first use of pepper spray by defendant Miller, at the direction of defendant Plumley, was a reasonable amount of force under the circumstances, and was done in a good faith effort to restore order in the prison unit.  Their Memorandum states:

> In the instant case, it is undisputed that a disturbance involving multiple inmates was in progress at the time Plaintiff was sprayed with pepper spray.  Plaintiff does not contest that he was not the only inmate sprayed.  Evidence shows that Miller's can of pepper spray malfunctioned, and the Phantom was deployed for only two bursts of one second each.  (Ex. B).  Thus, Plumley's and Miller's force was reasonable.  Plaintiff has no evidence beyond his own speculation and perception by which to contest the amount of spray, as he testified that he has no clock or other method of timekeeping in his cell.  (Ex. A at 36).  Further, Plaintiff has no evidence to credibly corroborate his own self-serving testimony that he was not a part of the disturbance.  Accordingly, Plaintiff cannot create a genuine issue of material fact sufficient to resist summary judgment.  *DiQuillo v. Prosperity Mortg. Corp.*, 981 F. Supp.2d 563, 570 (E.D. Va. 2013) ("[T]he law is well-

settled that uncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment.").

The substantial weight of the evidence on the record shows that Plumley and Miller used reasonable force while engaged in a good-faith effort to restore discipline during a multi-inmate disturbance in Quilliams II. (*See* Ex. C). Plaintiff can proffer no evidence beyond his own self-serving testimony that Defendants Plumley's and Miller's conduct was objectively unreasonable and therefore unconstitutional. Accordingly, Plaintiff's claims against Defendants Plumley and Miller fail as a matter of law and should be dismissed.

(ECF No. 97 at 18).

The defendants' Memorandum of Law further asserts that Cantrell's claim against Embrescia for the second deployment of pepper spray fails because Cantrell has specifically admitted that Embrescia did not act maliciously and sadistically. Specifically, their Memorandum of Law states:

As federal courts have explained, "'maliciously' and 'sadistically' have different meanings, and the two together establish a higher level of intent than would either alone. One acts 'maliciously' by undertaking, without just cause or reason, a course of action intended to injure another; in contrast, one acts 'sadistically' by engaging in extreme or excessive cruelty or delighting in cruelty." *Howard v. Barnett*, 21 F.3d 868, 872 (8th Cir. 1994). Here, Plaintiff cannot show that either Defendant specifically intended to injure him or delighted in their alleged conduct (which, of course, the Defendants dispute).

(ECF No. 97 at 12). The defendants rely upon statements made by Cantrell in his deposition to the effect that "I don't really think [Embrescia] got any pleasure from it, but he did it anyway" and "Yeah, he apologized to me. He said he knew it was wrong." (*Id.*, citing to ECF No. 96, Ex. A at 96). The defendants also rely upon the following statement from Cantrell's deposition:

Mr. Embrescia was just doing his job. I talked to him down here. We harbor no ill feelings towards each other. I mean, he understands it shouldn't have happened. He's told me before, "You were sitting on your bunk." But Officer Plumley gave him an order. He still should have disobeyed the

order, but I can't hold that against him.  I don't know what I would have
done in the situation . . . .

(*Id.* at 13, citing to ECF No. 96 at 50).  Thus, the defendants contend that "[b]y his own
admission, Plaintiff simply cannot establish facts sufficient for a reasonable factfinder to
conclude that Defendant Embrescia acted with the requisite subjective mental state
necessary to clear the high bar of 'malicious and sadistic' subjective intent."  (*Id.* at 14).
Accordingly, they assert that there is no genuine issue of material fact concerning
defendant Embrescia's liability and that he is entitled to judgment as a matter of law.  (*Id.*)

Additionally, citing to excerpts from the plaintiff's deposition in which he describes
the incident on March 16, 2014, the defendants' Reply contends that the plaintiff has
admitted that there was a disturbance occurring on his pod when this force was used and
thus there was a need for such force.  In pertinent part, the plaintiff testified as follows:

> Q.    Okay.  So kind of moving away from you specifically, just kind of a
> broader question, another hypothetical.  Assuming it was true that
> you have several inmates kicking their doors at the same time on
> night shift, would you consider this a disturbance in the prison?
>
> A.    Kicking their doors?
>
> Q.    Yes.
>
> A.    Yes, that would be a disturbance.

(ECF No. 99 at 8 n.2 and ECF No. 96, Ex. A at 54).

As previously noted by this Court, "[u]doubtedly, the surrounding circumstances
are vitally important when considering [the need for a use of force], as with all of the
*Whitley* factors."  *See Harper v. Blagg*, Civil Action No. 2:13-cv-19796, 2015 WL 6509131,
at *7 (S.D. W.Va. Oct. 28, 2015) (citing *Mann v. Scott*, Civil Action No. 14-3474-RMG,
2015 WL 5165198, at *5 (D.S.C. Sept. 1, 2015).  In *Harper*, the Court also found that it is
relevant to consider an inmate's undisputed history in determining whether there is a

perceived threat.  The defendants' Memorandum of Law asserts that Cantrell has admitted that he "intentionally caused trouble so [he] could get shipped" to MOCC and that he has been on the segregation units for three years due to "numerous incident reports and violations."  (ECF No. 97 at 2; ECF No. 96, Ex. A at 22, 66-67).

Cantrell does not dispute that there was a disturbance occurring on Pod 6 at the time of these uses of force; however, he disputes the defendants' contention that <u>he</u> was engaging in conduct that warranted the use of chemical agents on him at that time.  While the unsworn incident reports of the defendants uniformly indicate that Cantrell was kicking his door and yelling obscenities at the officers, Cantrell's verified Complaint and the affidavits of the other inmates on the unit contend that Cantrell was not engaged in such conduct.  (*See* ECF No. 2, Exs. A, 2A and 3A).  Cantrell contends that he was standing at his desk when he was first sprayed by Miller.  (ECF No. 98 at 11).  Cantrell's evidence further suggests that he was not given any orders to cease his conduct before defendant Miller attempted the first deployment of pepper spray, and further disputes that he was non-compliant before the deployment of the Phantom, contending that he was sitting on his bunk.  (ECF No. 2 at 6, ¶ 12; ECF No. 2, Ex. 3A; ECF No. 96, Ex. C at 4; ECF No. 98, Ex. V, Admission No. 1).

Cantrell also disputes the quantity of pepper spray that was deployed.  The defendants' evidence suggests that the can of pepper spray deployed by defendant Miller malfunctioned and barely sprayed at all.  (ECF No. 96, Ex. C at 1, 4 and 8).  Thus, the defendants' evidence further suggests that the deployment of the Phantom into Cantrell's cell was necessary because the first smaller can of Mark IX had malfunctioned and Cantrell was still non-compliant.  (*Id.*)

Conversely, Cantrell's Complaint contends that Miller used "an entire can" of pepper spray. (ECF No. 2 at 5, ¶ 4). The Affidavit of Steven Denkenberger, Jr. states that they "sprayed someone for what seemed to be about 15 seconds . . . or so." (ECF No. 2, Ex. 2A). The Affidavit of Joshua Menendez-Finch does not mention any time frame for the first deployment of pepper spray, but he states that Embrescia's deployment of the Phantom lasted for "7-8 sec." (ECF No. 2. Ex. 3A). Cantrell's Response to the Motion for Summary Judgment further asserts that defendant Embrescia deployed "a significant amount [of OC] under the plaintiff's door." (ECF No. 98 at 14, citing Exhibit U).

Cantrell further contends that he immediately asked to speak to the shift supervisor about the first deployment of pepper spray, which prompted Plumley to radio for additional officer support and the arrival of defendants Rhodes and Embrescia with the Phantom. Cantrell further contends that, when Embrescia deployed the Phantom, he was sitting on his bunk and yelling, "I'm on my bunk, I'm on my bunk" and, thus, the second deployment was wholly unnecessary, but was ordered by Plumley anyway. (*Id.* at 13). His contentions are also supported by the Ramsey, Denkenberger and Menendez-Finch Affidavits. (ECF No. 2, Exs. A, 2A and 3A).

Cantrell further asserts that he was left in his cell covered in pepper spray and in pain for 25-35 minutes (as also supported by the other inmates' affidavits), which he asserts was excessive and done for the purpose of causing pain. (ECF No. 2 at 7, ¶ 17; ECF No. 2, Exs. 1, 2A, 3A).[10]

Cantrell's evidence further indicates that defendant Plumley was taunting him after the deployment of the pepper spray, laughing and saying "Ahout, Ahout . . . What's

---

[10]  The defendants' incident reports suggest that Cantrell was kept in his cell for about 20 minutes. (ECF No. 96, Ex. C).

wrong with your face.  It burns, don't it" and that defendant Miller was also laughing.

(ECF No. 2 at 7, ¶ 7 and Exs. A, 2A and 3A).  Cantrell further contends that Miller and

Plumley falsified their incident reports by indicating that the first can of Mark IX

malfunctioned.  His Response states:

> Defendants Miller and Plumley both falsified their incident reports
> saying the Mark IX canister either malfunctioned and "fail short" [sic; fell
> short] of plaintiff according to defendant Plumley, or only hit plaintiff from
> the waist down because the stream on the Mark IX wasn't strong enough
> according to defendant Miller.  See Exhibits R and S which are defendants
> Plumley and Miller's Incident Reports.
>
> Plaintiff would like to argue that, if he was actively kicking his door
> as both defendants claim, why couldn't the Mark IX stream reach him only
> inches from the defendants?  The answer is simply that the Mark IX did
> work and soaked the plaintiff's face and torso.  Also, the plaintiff wasn't
> inches from the defendants actively kicking his door as they claim, but was
> standing at his desk minding his own business when he was brutally
> assaulted for no reason.

(ECF No. 98 at 11-12).

Cantrell's Response further contends that "this entire situation was orchestrated

by defendant Plumley for the sole purpose of causing pain.  He further contends:

> In a previous incident on March 3, 2014 between the plaintiff and defendant
> Plumley, defendant Plumley warned the plaintiff "I'll get you, I'll get you"
> because his boots had gotten wet.  Plaintiff contends that defendant Plumley
> used a situation in progress to get revenge.

(ECF No. 98 at 19).  Thus, Cantrell suggests that the comments made by Plumley before

and during this incident, while not definitive proof of malicious and sadistic intent, are

certainly indicative thereof and, "combined with other evidence, is enough to argue for

denial of summary judgment."  (*Id.* at 20).

In asserting that the defendants' conduct was unlawful, the plaintiff's Response

also relies on the defendants' alleged failure to comply with prison policy directives.  His

Response states "Defendants Rhodes, Embrescia, Miller and Plumley deliberately

disregarded all the policies in place that protect the plaintiff from excessive force."  (ECF No. 98 at 9).  Cantrell's Response specifically cites to Policy Directive 313.02 (Calculated Use of Force) which, he claims, only authorizes "that amount of force necessary to gain control of the inmate and to ensure good order."  P.D. 313.02 at (V)(B).[11]  Although the "amount of force necessary to gain control of the inmate" is not defined, Cantrell contends that the defendants herein certainly exceeded it.  (ECF No. 98 at 15).

The defendants' Reply brief reiterates their prior assertions that Cantrell has not offered sufficient evidence to create a dispute of fact on the issue of whether Miller and Embrescia's deployment of chemical agents was reasonable force in a good faith effort to restore order during an undisputed disturbance on the pod.  They contend that Cantrell's assertion that he was not engaged in the disturbance are uncorroborated and that his allegations concerning the amount of pepper spray deployed are speculative.  They further contend that Cantrell's accusation that Miller and Plumley falsified their incident reports is a "desperate, last-ditch effort to rescue his claims."  (ECF No. 99 at 8-9).

---

[11] The undersigned notes that P.D. 313.02 is not one of the policy directives provided in Cantrell's exhibits and, thus it is not a part of the record before this court.  Cantrell provided P.D. 313.04 concerning "Restrictions on the Use of Physical Force," which states in pertinent part that "appropriate procedure and practice restrict the use of physical force to instances of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to maintain or regain control, and then only as a last resort and in accordance with appropriate statutory authority."  It further states that "physical force shall not be justified as punishment."  (ECF No. 98, Ex. J).  He also provided P.D. 312.02 concerning "Less-Lethal Use of Force," which provides a "force continuum" consisting of five "levels of control" in response to resistance by an inmate. (ECF No. 98, Ex. K).

This court has repeatedly noted that "compliance with . . . [p]olicy [d]irectives may in certain circumstances be instructive on whether [d]efendants acted in good faith and whether they are entitled to qualified immunity."  *Harper v. McCloud*, No. 2:12-cv-00656, 2014 WL 1159129, at *21 (S.D. W. Va. Mar. 21, 2014); *Harper v. Blagg*, No. 2:13-cv-19796, 2015 WL 6509131, at *8 (S.D. W.Va. Oct. 28, 2015).  However, such policy directives are merely guidelines that "establish goals recommended by the organization in question," and do not constitute "constitutional minima."  Thus, non-compliance with such policies cannot establish a "per se" violation of an inmate's constitutional rights.  *Harper v. Blagg*, 2015 WL 6509131, at *8 (quoting *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979)).  The undersigned has not directly relied upon the policy directives in proposing the findings made herein.

Addressing the use of the chemical agents against Cantrell, the evidence of record, taken in the light most favorable to him, establishes genuine issues of material fact concerning all four *Whitley* factors. Cantrell's evidence suggests that he was not engaging in the disruptive conduct as contended by the defendants and that no orders were given to him by defendants Miller, Plumley or Embrescia before the deployment of the chemical agents. The defendants' evidence, on the other hand, asserts that Cantrell fully participated in the disruptive conduct, which was prevalent in the pod, and that he failed to comply with defendant Plumley's "loud clear commands" necessitating the use of pepper spray to restore order.

Thus, there are genuine issues of material fact concerning the need for the use of force against Cantrell (the first *Whitley* factor), the threat perceived by the defendants (the third *Whitley* factor) and the efforts to temper a forceful response (the fourth *Whitley* factor*). See Glascoe v. Sowers*, No. ELH-11-2228, 2013 WL 5330503, *6 (D. Md. Sept. 20, 2013) ("Eighth Amendment violations have . . . been found when a chemical agent was used without prior verbal command, or after a prisoner had been subdued or had become compliant with an officer's instructions); *see also Henslee v. FNU Singleton*, No. 1:13-cv-90-FDW, 2015 WL 4920260, *5 (W.D.N.C. Aug. 18, 2015) ("A correctional officer uses excessive force if he approaches a prisoner and, without any provocation by the prisoner, aside from verbal taunts, sprays pepper spray in the prisoner's face.") (citing *Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. 2014).

There also appears to be a genuine dispute of fact concerning the amount of force (OC spray) used against Cantrell (the second *Whitley* factor). In *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008), well before the incident in question, the United States Court of Appeals for the Fourth Circuit established that, while "some dispersal of pepper spray

may be warranted in carrying out a cell extraction," and pepper spray "is a commonly used method of incapacitating inmates for this purpose," "it is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas *or other chemical agents in quantities greater than necessary* or for the sole purpose of infliction of pain."  Because there is an issue of fact as to whether <u>any</u> use of force against Cantrell was appropriate, the Court should also find that there are genuine issues of material fact concerning the amount of force used.

Furthermore, a reasonable inference can be drawn from the evidence concerning the comments and laughter by defendants Plumley and Miller, Plumley's alleged prior threat to Cantrell, and the evidence suggesting that Cantrell was left in his cell covered in pepper spray for in excess of 20 minutes, that these uses of force were done maliciously and sadistically and not solely for the purpose of restoring order.  Although the defendants assert that Cantrell's testimony that he didn't think defendant Embrescia got any pleasure from spraying him, Cantrell's deposition testimony also indicated that Embrescia apologized and "said he knew it was wrong" because "you were sitting on your bunk." (ECF No. 96, Ex. A at 50, 96).  Thus, there appears to be question of fact concerning Embrescia's state of mind concerning this use of force.

Based upon the evidence of record, the undersigned proposes that the presiding District Judge **FIND** that there are genuine issues of material fact concerning the conduct of defendants Plumley, Miller and Embrescia with regard to the deployment of chemical agents against Cantrell on March 16, 2014.

<u>*The placement of Cantrell in the restraint chair*</u>

Several hours after Cantrell was pepper sprayed, he and other inmates on Pod 6 flooded their cells.  Cantrell contends this was done in an effort to wash away pepper spray

that remained in the cells and on the pod from the earlier incidents. Cantrell further contends that defendants Miller and Embrescia entered the pod and turned off the water, thus limiting any potential for additional flooding. Cantrell further maintains that he submitted to being placed in mechanical restraints and was removed from his cell without resistance. Nevertheless, defendant Daniel Hahn ordered that he be placed in a restraint chair. Cantrell contends that such placement was entirely unnecessary because he was being compliant and, thus, was done as punishment for flooding his cell.

Cantrell further asserts that he was placed in the restraint chair without being given an opportunity to go to the bathroom and that, over the course of the time he was in the chair, his requests to defendants Plumley and Embrescia to use the bathroom were denied, until he could no longer hold his bladder and urinated on himself. Accordingly, Cantrell contends that the conduct of defendants Hahn, Plumley, Embrescia Rhodes and Miller[12] with regard to his placement in the restraint chair violated the Eighth Amendment. (ECF No. 2 at 18, ¶ 62).

Beginning with defendant Hahn, the defendants' Memorandum of Law in support of their Motion for Summary Judgment asserts that Cantrell has put forth no evidence that Hahn acted with deliberate indifference to his substantial rights with regard to the restraint chair. (ECF No. 97 at 15). The defendants further contend that Cantrell has admitted that it is only his opinion that defendant Hahn's actions violated policy. As noted by the defendants, during his deposition, Cantrell testified:

> A.        . . . Lieutenant Hahn, the problem with him is he was the one that
>           ordered me to be placed in the restraint chair. To me, that violates

---

[12] Cantrell includes Miller in this claim; however, there are no facts alleged in the Complaint indicating that Miller was involved in his placement in the restraint chair. The last fact alleged against Miller is that he and Embrescia turned off the water to Cantrell's cell. (ECF No. 2 at 9, ¶ 21). All of the factual allegations concerning the restraint chair appear to involve defendants Hahn, Plumley and Embrescia. (*Id.* at 9-10, ¶¶ 26-33).

their policy.  That was excessive force.  That's the reason I filed suit
against him.  That's my understanding against him.

(ECF No. 97 and ECF No. 96, Ex. A at 89).  The defendants further assert that Cantrell is

not even certain of what policy governs the use of a restraint chair and contends that he

has never read the policy.  (*Id.*)  Of note, the defendants asked Cantrell what he believes

Hahn should have done.  Cantrell testified as follows:

> Q.    . . . what should Lieutenant Hahn have done differently?
>
> A.    Lieutenant Hahn should have come and assessed the situation.  He
> never came to the unit to speak to nobody.  He never asked what had
> happened.  He never asked what was going on.  He automatically
> took the side of the people that did it, never came to talk to no one.
> He gave an order without even assessing the situation.  He had no
> clue what was going on because he never entered the unit.

(ECF No. 97 at 16 and ECF No. 96, Ex. A at 89-90).

The defendants maintain that Cantrell has offered nothing more than conclusory

allegations and mere speculation and "has put forth no facts by which to show that

Defendant Hahn actually knew that the actions of any other officer created a risk to

Plaintiff's rights, that a risk was obvious that defendant Hahn could not have failed to

know of it, or that Defendant Hahn actually knew his actions (or inactions) were

insufficient."  (ECF No. 97 at 16-17)

Cantrell's Response asserts that, per policy, inmates are supposed to be allowed

access to the restroom prior to being placed in the restraint chair, and that the restraint

chair is not supposed to be used as punishment, but rather only if the inmate is a danger

to himself or others.  (ECF No. 98 at 6 and Ex. C).  His Response further asserts:

> Since the plaintiff was being compliant and less restrictive measures could
> have resolved the situation, like turning off the water, which was already
> done, plaintiff was being subjected to cruel and unusual punishment by
> being placed in the restraint chair for punishment.  Defendants Rhodes,
> Embrescia, Miller and Plumley failed to intervene by simply following

35

> orders to place plaintiff into the restraint chair and also by not allowing plaintiff access to the restroom prior to his placement in the restraint chair. See Exhibits K and L - which are Incident Reports filed by Jason Rhodes and John Embrescia. See Exhibit M – which is the Incident Report filed by Defendant Plumley that details step by step exactly what took place before plaintiff was placed in the restraint chair and shows plaintiff wasn't allowed to use the restroom at any point.

(ECF No. 98 at 6-7). Cantrell contends that, despite his repeated requests, Embrescia and Plumley refused to allow him to use the restroom. (*Id.* at 7). Cantrell's Response further asserts:

> Plaintiff argues that once the water to his cell was shut off the incident had been resolved and the defendants failed to temper the severity of their response by placing the plaintiff in the restraint chair. Per MOCC policy the plaintiff was supposed to be given a chance to use the restroom prior to being placed in the restraint chair. See Exhibit C – which is a grievance plaintiff filed concerning him having to urinate on himself while in the restraint chair. The grievance was appealed to defendants Ballard and Rubenstein who both agreed with the initial response.[13]

(*Id.* at 22-23 and Ex. C).

The defendants' Reply reiterates their assertion that Cantrell's claim against Hahn concerning his placement in the restraint chair cannot rise above a speculative level because he admittedly has never seen the WVDOC policy governing the use of the restraint chair.[14] The defendants further assert that, at most, Cantrell's deposition testimony that Hahn "should have done more" sounds in negligence, which does not rise

---

[13] The initial response to the grievance, which contains an illegible signature (but believed to be Captain Steve Caudill who is not a defendant herein) states "You are given the opportunity to use the bathroom prior to being placed in the chair." (ECF No. 98, Ex. C). The undersigned notes that the response states "you are given" and not "you were given." Additionally, the defendants have been deemed to have admitted that Cantrell was not permitted to use the restroom before or during his placement in the restraint chair. (ECF No. 98 at Ex. V). However, the undersigned notes that Exhibit BB attached to Cantrell's Response is an Intensive Supervision Log sheet completed by defendant Hahn. It indicates that Cantrell was permitted to use the restroom before commencement of intensive supervision. (ECF No. 98, Ex. BB). Cantrell disputes the veracity of this document. (ECF No. 98 at 23).

[14] Whether the defendants complied with prison policy directives is not dispositive of the issue and can only be considered as a factor in determining whether or not force was used in good faith.

to the level of deliberate indifference.  (ECF No. 99 at 7).  The Reply does not appear to directly address Cantrell's claims against the other defendants who were involved in his placement and monitoring in the restraint chair.

Whether Cantrell was being compliant when the defendants placed him in the restraint chair, and, thus, whether there was a need for such use of force, is a material fact that is in dispute.  Furthermore, there appears to be a genuine issue of material fact as to whether Cantrell was denied the ability to use the restroom prior to or during his placement in the restraint chair.  Thus, there remain unresolved material factual issues concerning the use of the restraint chair under the circumstances.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that defendants Hahn, Plumley, Embrescia and Rhodes are not entitled to judgment as a matter of law on Cantrell's Eighth Amendment claims concerning his placement in the restraint chair.

However, there is absolutely no evidence of record indicating that defendant Miller was involved in the placement of Cantrell in the restraint chair, or his monitoring while he was restrained.  Thus, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact concerning Miller's conduct with respect to Cantrell and the restraint chair and, thus, he is entitled to judgment as a matter of law with respect to this claim.

### *The objective component of Cantrell's Eighth Amendment claims*

Turning to the objective component of an Eighth Amendment claim, Cantrell alleges that, after being pepper sprayed, he could not breathe, suffered a panic attack and "suffered for days from the extreme amounts of 'chemical agents' in his eyes, face and body" and the continued "contact contamination for several weeks from the surfaces of his cell."  His Complaint further claims that he suffered "mental stress from having to

37

endure pain and humiliation from the abuse, then having to urinate on himself." He contends that he was forced to see mental health and was "placed on additional psych medication." (ECF No. 2 at 13; *see also* ECF No. 98 at 32-33).

Cantrell's Response to the defendants' Motion for Summary Judgment further addresses his alleged injuries as follows:

> As a direct result of the chemical agents the Plaintiff suffered excruciating pain for over 20 minutes before being decontaminated. Severe skin irritation, burns, rash and redness of skin over the majority of his body that lasted for several days. Plaintiff suffered from blindness for over 20 minutes and nearly lossed [sic; lost] consciousness on several occasion[s] due to feeling like he was suffocating for over 20 minutes covered in "OC" and breathing in "<u>Phantom</u>"

(ECF No. 98 at 30-31). Cantrell offers the MSDS sheet for Sabre Red Phantom and the label from a canister of the same (ECF No. 98, Exs. EE and FF), which, *inter alia*, state that it can aggravate medical conditions such as asthma and emphysema. Cantrell contends that his limited lung capacity placed him at risk for more severe effects and that his exposure to this chemical was "so hazardous that by leaving him exposed to it for so long put [him] at severe risk to his health." (ECF No. 98 at 31-32).

Cantrell further contends that, as a result of being placed in the restraint chair, he suffered cramping and pain in his foot, legs and arms, as well as stiffness and soreness all over his body that lasted for several days, and suffered the humiliation of urinating on himself. He further contends that he has suffered "trouble with his bladder" since this incident. (*Id.* at 33).

"Courts previously found that similar adverse physical reactions to pepper spray or other chemical munitions were sufficient to create genuine issues of material fact as to the objective inquiry of an excessive force claim." *See Harper v. Blagg*, No. 2:13-cv-32832, 2015 WL 6509131, *10 (S.D. W. Va. Oct. 28, 2015) (Johnston, J.) (citation

omitted).[15]   Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Cantrell has established a genuine issue of material fact concerning the objective component of Cantrell's Eighth Amendment claims.

### B.   The failure to intervene claims.

Cantrell's claims against defendant Jason Rhodes appear to be limited to his alleged failure to intervene when defendant Embrescia sprayed him with the Phantom, and also his failure to intervene to stop Cantrell's placement in the restraint chair. Cantrell specifically contends that defendant Rhodes violated his Eighth Amendment rights "by being present when defendant Plumley ordered the unnecessary use of force and failed to intervene or call the shift supervisor."[16]   (ECF No. 2 at 17, ¶ 61).   He also contends that Rhodes again violated his Eighth Amendment rights "by not contacting Defendant Hahn and informing him that the Plaintiff needed to use the restroom until after the Plaintiff urinated on himself."   (*Id.* at 18, ¶ 62).

Generally, an "officer may incur § 1983 liability only through affirmative misconduct."   *Randall v. Prince George's Cnty., Md.,* 302 F.3d 188, 202 (4th Cir. 2002). "Although personal liability premised on an omission is a disfavored concept, it is well-established that an omission to act, when coupled with a duty to act, may provide a basis for liability."   *Id.* at 203.   An "officer may not stand by idly while a citizen's constitutional

---

[15]   *See also Tedder*, 527 F. App'x at 274 ("Tedder's adverse physical reaction to the pepper spray – gagging, breathing difficulty, and vomiting – establishes that the nature of the force Sgt. Johnson used against Tedder was nontrivial."); *Peyton v. Clark*, 2014 WL 4657802, *6 (W.D. Va. Sept. 16, 2014) (finding that plaintiff's exposure to OC spray and puncture wounds from K9 bite were objectively harmful enough to satisfy the objective prong of the Eighth Amendment); *Blount v. Collins*, No. 7:12-cv-00476, 2013 WL 4084764 *4 (W.D. Va. Aug. 13, 2013) (finding that plaintiff's claim that the pepper spray caused breathing problems, chest pain, and a painful burning sensation in his eyes, nose and skin that lasted for some time after the attempted decontamination in the shower was sufficient to present a genuine issue of fact for trial on the objective component of his excessive force claim).

[16]   As previously noted, paragraph 13 of the Complaint also alleges that defendant Miller failed to intervene to stop this conduct.   (ECF No. 2 at 7, ¶ 13).

rights are violated by another officer; he has an affirmative duty to intercede on the citizen's behalf." *Browning v. Snead*, 886 F. Supp. 547, 552 (S.D. W. Va. 1995). The Fourth Circuit has recognized "a cause of action for bystander liability 'premised on a[n] . . . officer's duty to uphold the law and protect the public from illegal acts, regardless who commits them.'" *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 416-17 (4th Cir. 2014) (quoting *Randall*, 302 F.3d at 203). Bystander liability is established if: (1) an officer knows that a fellow officer is violating an individual's constitutional rights: (2) the officer has a reasonable opportunity to prevent the harm; and (3) the officer chooses not to act. *Randall*, 302 F.3d at 204; *see also Bacon v. Wood*, 616 F. App'x 601 (4th Cir. 2015) (citing to this analysis with regard to a bystander liability claim against a correctional officer concerning an inmate's deliberate indifference claim).

The crucial element of bystander liability is whether the officer had a reasonable opportunity to prevent the harm. In fact, in a recent case, the presiding District Judge granted summary judgment on a bystander liability claim, finding that the defendants against whom that claim was brought did not have a reasonable opportunity to intervene because the circumstances suggested that the incident occurred "without warning" and in a "very brief" time. *See Harper v. Blagg, supra*, 2015 WL 6509131, at *14.

The defendants' Memorandum of Law asserts that "Plaintiff testified Defendant Rhodes did not enter the picture until ***after*** Plaintiff had already been sprayed by Miller (*see* Ex. A at 28-29), and therefore could not have had firsthand knowledge of the events leading up to Plaintiff's spraying." (ECF No. 97 at 14-15). Thus, they assert that, at best, Cantrell's allegations might demonstrate negligence, but cannot support a constitutional claim. (*Id.*) They further assert that Cantrell has not established that Rhodes knew that

the actions of the other officers created an obvious risk to him and actually knew that his actions were insufficient. (*Id.*)

In the instant case, Rhodes came into Cantrell's pod at the same time as Embrescia, who was carrying the can of Phantom. Cantrell contends that he was sitting on his bunk and asking the officers to call the shift supervisor before Embrescia actually deployed the Phantom. Cantrell's verified allegations, the affidavits of the other inmates and the defendants' incident reports suggest that there was enough time for Cantrell to specifically ask defendant Rhodes to get the shift supervisor. Taking this evidence in the light most favorable to Cantrell, there is a genuine issue of material fact concerning whether Rhodes had an opportunity to intervene to attempt to stop the second deployment of chemical agents. To the extent that such claim is also brought against defendant Miller, as alleged in paragraph 13 of the Complaint, the same would be true. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there are genuine issues of material fact concerning the bystander liability claims against defendants Rhodes and Miller with regard to their conduct related to the second deployment of chemical agents against Cantrell.

With regard to Cantrell's second claim, that Rhodes (as well as Plumley, Embrescia and Miller) should have intervened to advise defendant Hahn of Cantrell's requests to go to the restroom before he urinated on himself, the undersigned views these allegations as a part of the claim that Cantrell's placement in the restraint chair was an excessive use of force and constituted cruel and unusual punishment, which has already been addressed herein. Nevertheless, beginning with the premise that there is a genuine issue of material fact as to whether there was <u>any</u> need to place Cantrell in the restraint chair, there is also certainly a genuine issue of material fact concerning the circumstances that occurred

while he was in the chair.  Those circumstances occurred over a longer period of time, as Cantrell was in the restraint chair for one hour and fifty minutes.  Thus, the defendants who placed and monitored him in the restraint chair had a reasonable opportunity to intervene to seek to have him removed from the chair and/or to allow him to use the restroom.

Taking the evidence in the light most favorable to Cantrell, the undersigned proposes that the presiding District Judge **FIND** that there are genuine issues of material fact concerning Cantrell's bystander liability claims against defendants Rhodes, Plumley, Embrescia with regard to their conduct related to Cantrell's placement and monitoring in the restraint chair.  However, the undersigned further proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact and defendant Miller is entitled to judgment as a matter of law on Cantrell's second bystander liability claim against him because there is an absence of evidence demonstrating that he was even involved in the placement and monitoring of Cantrell in the restraint chair.

### B.    Cantrell's supervisory liability claims.

Cantrell's remaining claims attempt to hold defendants Rubenstein, Ballard, Frame and Hahn liable for the conduct of their subordinates on a theory of supervisory liability.  Specifically, the verified Complaint asserts that:

> 53)    Defendants Rubenstein, Ballard and Frame violated Plaintiff's Eighth Amendment right to be free from Cruel and Unusual Punishment by putting policies in place at Mount Olive Correctional Complex allowing inmates to be placed in the restraint chair for punishment; even if the inmate is not a danger to himself or others, being compliant, and less restrictive measures could resolve the situation.

> 54)    Defendants Rubenstein, Ballard, Frame and Hahn violated the Plaintiff's Eighth Amendment right to be free from Cruel and Unusual Punishment by allowing the training of officers to use

"chemical agents" on compliant inmates whom they only "suspect"
of committing a rule violation.

(ECF No. 2 at 15, ¶¶ 53 and 54). Additionally, to the extent that such claims have not been

addressed already in terms of his direct liability, Cantrell also asserts that defendant

Plumley violated his Eighth Amendment rights by "using his authority" to order his

defendants Miller and Embrescia to spray Cantrell with chemical agents when he was

being compliant. (*Id.*, ¶¶ 56-57).

The defendants' Memorandum of Law asserts that defendants Rubenstein, Ballard

and Frame "did not participate or stand idly by and watch the purported misconduct

alleged in the Complaint." (ECF No. 97 at 8). Thus, the defendants address these claims

under the Fourth Circuit's decision in *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), in which

the Court held that a supervisor may be liable for the actions of his subordinates where

the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized

or approved, prior constitutional violations. Such liability is not based on *respondeat

superior*, but rather upon "a recognition that supervisory indifference or tacit

authorization of subordinates' misconduct may be a causative factor in the constitutional

injuries they inflict on those committed to their care." 13 F.3d at 798 (*quoting Slakan v.

Porter*, 737 F.2d 368 (4th Cir. 1984)).

The defendants' Memorandum of Law further contends that the plaintiff has failed

to establish that these defendants had knowledge of any conduct on the part of defendant

Plumley that carried a "pervasive and unreasonable risk of constitutional injury" to

Cantrell, or that there is any direct causal link between any such knowledge and Cantrell's

alleged injury. (ECF No. 97 at 9). The defendants' Memorandum of Law states:

In support of his allegations against Defendant Rubenstein, Plaintiff
states that Rubenstein, the Commissioner of Corrections, was made aware

> of "what was going on" via "several grievances over the years" yet "did
> nothing." (Ex. A at 80-81). Plaintiff has failed to provide any specific facts
> or, indeed, any independent corroboration of his allegations whatsoever.
> Plaintiff admits that he "never met [Defendant Rubenstein]." (Ex. A at 72).
> Without any specific facts or corroboration, Plaintiff's allegations that
> Defendant Rubenstein was deliberately indifferent to Plaintiff's
> constitutional rights is nothing more than self-serving speculation and
> patently cannot resist summary judgment.

(ECF No. 97 at 10). Similarly, the defendants contend that Cantrell cannot establish any

such awareness or misconduct by defendant Ballard. Their Memorandum of Law further

states:

> Plaintiff alleges that Defendant Ballard "set into place" a policy of "martial
> law" which allowed officers "free rein" to act without tempering force. (*See*
> Ex. A at 83, 84). Plaintiff quickly backtracked at deposition, however,
> admitting that his allegation that Defendant Ballard was the architect or
> foster of such a policy [footnote omitted] was, again, merely speculation . . .

(*Id.* at 10, citing ECF No. 96, Ex. A at 85). The defendants further contend that the

evidence relied upon by Cantrell is nothing more than hearsay and speculation, which

cannot be considered on summary judgment. (*Id.* at 10 n.3).

The defendants' Memorandum of Law also contends that Cantrell has failed to

allege any facts to support his allegation that defendant Frame, the Assistant Warden of

Security, failed to properly train his subordinate officers, and that Cantrell admitted at

his deposition that he did not know of any basis for alleging illegal action by defendant

Frame. (ECF No. 97 at 11 and ECF No. 96, Ex. A at 85-87). Thus, the defendants contend

that Cantrell's allegation is nothing more than a bare conclusion that "[h]e's the assistant

warden of security . . . it's his fault." (ECF No. 96, Ex. A at 87). The defendants further

contend that the evidence of record clearly demonstrates that defendants Plumley,

Embrescia, Miller and Rhodes were subjected to training concerning the use of chemical

agents, similar to other officers. (ECF No. 97 at 11 and ECF No. 96, Ex. B).

44

Thus, the defendants assert that Cantrell can identify no admissible direct or circumstantial evidence to establish that defendants Rubenstein, Ballard and Frame were aware of any conduct by defendants Plumley, Embrescia, Miller or Rhodes by which to anticipate the alleged misconduct directed towards Cantrell, or certainly none to establish that defendants Rubenstein, Ballard or Frame actually drew such an inference from the conduct of their subordinates.  (ECF No. 97 at 11).

Cantrell's Response asserts that "not only should defendants Rubenstein, Ballard and Frame have known excessive force was being used by subordinates, but actually encouraged it with certain 'off the books policies.'"  (ECF No. 98 at 42).  He contends that defendant Rubenstein cannot assert that he was unaware of what other defendants were doing because he has administrative direction over the Warden and has responsibility as the chief executive officer to enforce all orders, rules and regulations.  Cantrell's Response states:

> See <u>Exhibit KK</u> – which lays out in great detail the "Nature of Work" for defendant Warden Ballard.  "<u>Under administrative direction of the Commissioner of Corrections (defendant Rubenstein</u>), performs as the chief executive officer of a prison and shall have charge of its internal police and management and provide for feeding, clothing, working, and taking care of the convicts, subject to the <u>control of the State Commissioner of Corrections</u>.  Shall promptly enforce all orders, rules and regulations made by the <u>Commissioner of Corrections</u>, enforces strict discipline among the convicts, protects and preserves the property of the State, and may for that purpose <u>punish the convicts or cause them to be punished in the manner authorized by the Commissioner of Corrections</u>.  Shall have the custody and control of all real and personal property at the penitentiary, <u>subject to the orders of the Commissioner of Corrections</u>.  Performs related work as required.

(ECF No. 98 at 42-43).  Cantrell further asserts that "[t]his shows that not only does defendant Ballard have to be responsible for the actions of his staff that he was aware of, but also defendant Rubenstein is responsible as well."  (*Id.* at 43).

Turning to his claim against defendant Ballard, Cantrell asserts that "Defendant Ballard actually gave his subordinates free reign when it came to use of force on inmates in the segregation units and called this "Marshal Law." [sic; Martial Law]. (*Id.*) His Response further states:

> See Exhibits LL, MM and NN.  **Exhibit LL** is a request sent to Lt. Brian Penick who is now the Captain in charge of segregation units.  He clearly states "Per Warden (defendant Ballard) 'Martial Law' is a condition that MOCC utilizes."  Exhibit MM takes it even further and details in a grievance filed by inmate Andre Wilson just what "Marshal Law" [sic; Martial Law] meant to the officers working the segregation units.  This grievance is important because it was appealed to defendant Ballard who refused to comment on it and only affirmed unit team response by Lt. Hahn.  After that, the grievance was appealed to defendant Rubenstein who denied it, but this obviously made him aware of the "Marshal Law" [sic; Martial Law] practice at MOCC.  Exhibit NN - Plaintiff's First Request for Admission for Defendants Ballard and Frame pursuant to Rule 36(a)(3) of the Federal Rules of Civil Procedure: "A matter is admitted unless within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."  Plaintiff served the defendants on 7/31/15 via United States Postal Service and still hasn't received a response, so therefore the admissions are admitted to.
>
> Plaintiff believes defendants will deny that "Marshal Law" [sic; Martial Law] was ever used because plaintiff has nothing directly from defendant Ballard.  However, what plaintiff can prove is that the defendants were aware inmates' constitutional rights were being violated under their supervision.  Exhibits OO and PP prove that not only did defendants have knowledge of excessive force being used, but shows they instigated it.  Exhibit OO is an internal memo from Major Robert Rhodes sent to defendants Ballard and Hahn.  Defendant Frame is the assistant warden of security and therefore would have to of [sic; have] approved this "protocol."

(ECF No. 98 at 43-45).

Cantrell further asserts that Major Rhodes' memo advises subordinates not to temper the severity of force used on segregation inmates, such as himself and that, if force is used against such inmates, they should <u>always</u> be placed in the restraint chair and also be placed in the Behavior Management Program ("BMP") (described by Cantrell as a strip

cell behavioral management program).  (*Id.* at 46).  Cantrell asserts "that is three separate punishments for a single incident that an inmate does [sic; receives] regardless of the severity."  (*Id.*)  In further support of his supervisory liability claim, Cantrell offers a grievance filed by inmate Casey Rygh on August 18, 2012, concerning a use of chemical agents and a sting grenade against him and his subsequent placement in a restraint chair. The staff response to this grievance states "being in a control unit, efforts to temper are not needed or required."  The grievance further indicates that Warden Ballard's response to the grievance appeal acknowledged his belief that "The Captain is correct in his response."  This grievance response was also upheld by defendant Rubenstein.  (ECF No. 98 at 46 and Ex. PP).

Cantrell acknowledges that he bears a heavy burden to prove supervisory liability. However, he contends that case law clearly establishes that "a supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980).  Cantrell further asserts that:

> The outer limits of liability in any given case are determined ultimately by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked. The final determination "generally is one of fact, not law."  *Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir. 1981), but state statutes fixing the administrator's legal duties provide a useful guide in determining who has the responsibility and capability to end the offensive practices.
>
> Plaintiff argues that defendants Rubenstein, Ballard, Frame and Hahn are just as responsible for the pain he suffered as are defendants Plumley, Miller, Embrescia and Rhodes, if not more so.  Instead of taking action on years of excessive force complaints, the defendants reinforced the behavior and encouraged it.  All use of force is reviewed by a committee, but the results are always the same regardless of the situation.  See Exhibits QQ, RR and SS.  QQ is plaintiff's Use of Force Committee review sheet and notes

at the end of pg. 3 that plaintiff denied kicking his door and reported his cell door security light didn't work.  The committee never looked into the matter.  On all use of force reviews are finally signed off on by defendant Ballard.  No action is ever taken by defendant Ballard besides concurring with the committee and taking the side of the officers.  Defendant Ballard reports directly to defendant Rubenstein and therefore both are aware of every use of force and the situation leading up to it according to the officers involved.  By not looking into reports of excessive force, the defendants are just as liable as the officers who committed the acts of violence themselves.

(ECF No. 98 at 48-49 and Exs. QQ, RR and SS).

Cantrell contends that he has alleged specific facts and included exhibits from which a reasonable inference can be drawn that the conduct of each of these supervisory defendants violated his constitutional rights through the "promulgation, implementation, and/or continued enforcement of a policy or procedure that exposes inmates to excessive and unnecessary uses of force when such use of force was not justified under the circumstances and was for malicious and sadistic purposes, rather than simply to restore order."  (*Id.* at 53).  Accordingly, Cantrell asserts that summary judgment for these supervisory defendants should be denied.  (*Id.* at 53-54).

Cantrell relies, in part, on the "large number of lawsuits" that have been filed by segregated inmates at MOCC concerning alleged excessive force by various subordinates and he lists 10 such cases.  (*Id.* at 55).  He claims that these are just a few of the many, "but should show that the Defendants were well aware of the abuse taking place on the Quilliams Unit at Mount Olive."  (*Id.*)

The defendants' Reply asserts that Cantrell's reliance upon grievances and lawsuits is insufficient to impute knowledge to defendants Rubenstein and Ballard.  (ECF No. 99 at 3-4).  Their Reply further states:

First, neither grievance reference[s] any acts by ***any*** named Defendant sufficient to show that Defendants Rubenstein and Ballard "**actually . . . perceived** the risk" to Plaintiff's constitutional rights.  *Rich v. Bruce*, 129

48

F.3d 336, 340 n.2 (4th Cir. 1997).  Second, Plaintiff submits these grievances to this Court to demonstrate the truth of the matter asserted therein – *i.e.*, that the acts alleged in the grievance actually took place.  Such hearsay cannot be considered in a motion for summary judgment, much less create an issue of material fact.  *See* F.R.C.P. 56(c)(2); *Maryland Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) (noting that "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.")

Plaintiff similarly asserts that a litany of lawsuits put Defendants Rubenstein and Ballard on notice of the risk of constitutional injury to Plaintiff. * * * However, Plaintiff admits that these were settled; mere filing of a lawsuit does not impute liability nor the truth of the matter asserted.  Even if Plaintiff could explain how the allegations in these lawsuits were both true and relevant to his case (which he did not), they likewise cannot be considered, as they are hearsay.  *See* F.R.C.P. 56(c)(2); *Maryland Highways Contractors Ass'n*, 933 F.2d at 1251.  Put simply, Plaintiff has asserted nothing but hearsay and speculation to support his claim that Defendants Rubenstein and Ballard had **actual knowledge** of conduct by a subordinate which posed pervasive and unreasonable risk of constitutional injury to the plaintiff.  [Citation omitted].

(ECF No. 99 at 4).

The defendants' Reply further reiterates their position that Cantrell has failed to identify any facts whatsoever by which to assert wrongdoing by defendant Frame.  (*Id.* at 5).  Instead, they contend, "Plaintiff merely beats the same tired drum, broadly asserting the unsupported legal conclusions of vicarious liability."  (*Id.*)  Thus, they contend that summary judgment is appropriate for defendant Frame. (*Id.*)

On April 25, 2016, Cantrell filed a "Supplemental Response" (really an unauthorized sur-reply) in which he attempts to establish a basis for defendants Rubenstein, Ballard and Frame's actual knowledge of "the overwhelming use of excessive force being used on the Quilliams segregation units."  (ECF No. 102 at 1).  Based upon two years' worth of documentation of uses of chemical agents and the restraint chair against inmates on the segregation units, which was ordered by the court to be produced to him, Cantrell's Supplemental Response attempts to set forth, in a chart form, the number of

incidents involving the use of chemical agents and/or the restraint chair, that occurred on the segregation units from March 2012 until March 16, 2014.  (*Id.* at 2-3).

Cantrell also asserts that "these numbers are completely false" and that the defendants have continued to withhold information ordered by the court to be produced to him.  (*Id.* at 2-3).  He points out specific uses of force that occurred in the ordered time period of which he is aware for which no information was produced by the defendants. (*Id.* at 3-5).  Nevertheless, Cantrell asserts that he has provided ample evidence to establish his supervisory liability claims.  (*Id.* at 5).

The defendants subsequently filed a "Supplemental Reply" (also an unauthorized sur-reply) which largely repeats the arguments made in their Reply.  (ECF No. 104).  In summary, the defendants basically assert that, despite being provided with hundreds of pages of discovery since his prior brief, Cantrell still cannot establish a credible basis for liability by any of the supervisory defendants and has not demonstrated a genuine issue of material fact thereon.  Thus, they again assert that the supervisory defendants are entitled to judgment as a matter of law.  (*Id.*)

In reviewing the supervisory liability claims, the undersigned has relied only upon the following evidence:  Cantrell's verified allegations in the Complaint (ECF No. 2); excerpts from Cantrell's deposition (ECF No. 96, Ex. A); the defendants' incident reports and the Use of Force Review Committee Reports; the affidavits of Samuel Ramsey, Steven Denkenberger and Joshua Menendez-Finch; and the defendants' admissions.

Defendants Ballard and Frame have been deemed to have admitted that, at the time of these incidents, correctional officers were instructed not to temper the severity of force used on inmates in the segregation units, and that the term "Marshal [sic; Martial] Law" was being used by staff as a condition being utilized on the Quilliams units at MOCC.

50

(ECF No. 98, Ex. V).  Furthermore, the Use of Force Committee Reports offered by Cantrell demonstrate that Frame is a member of that committee and Ballard is provided those reports after every use of force and is called upon to ratify or disagree with the committee's findings of whether each use of force was reasonable.  Cantrell contends that "the results are always the same" and, as a matter of course, Ballard has concurred that every use of force is reasonable with no further investigation or action, as demonstrated by the reports from the incidents on Pod 6 on March 16, 2014.  (ECF No. 98 at 49 and Exs. QQ, RR and SS).

Even if the court relies only on this limited evidence, there are genuine issues of material fact concerning whether excessive force was used by Ballard and Frame's subordinate officers.  Additionally, construing the evidence in the light most favorable to Cantrell, the undersigned finds that evidence exists that would indicate that Ballard and Frame were aware of an unreasonable risk of harm or misconduct by their subordinates and failed to take action.  Cantrell has alleged specific facts that could allow a factfinder to draw a reasonable inference that Ballard and Frame's conduct violated Cantrell's constitutional rights through the promulgation, implementation and/or continued enforcement of a policy or procedure that exposes inmates to excessive and unnecessary uses of force when such use of force was not justified under the circumstances, and was for malicious or sadistic purposes, rather than simply to restore order, otherwise known at the prison as "Martial Law."  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that defendants Ballard and Frame are not entitled to judgment as a matter of law on Cantrell's supervisory liability claims.

However, Cantrell fails to present sufficient evidence of actual or constructive knowledge by defendant Rubenstein of the alleged misconduct of his subordinates.

51

Cantrell suggests that Rubenstein may be held liable due to his role in receiving and affirming administrative remedies.   However, it is well-established that denying a prisoner's grievances, by itself, "is not the type of personal involvement required to state an [Eighth Amendment] claim."   *See, e.g., Lowe v. Matheney*, No. 2:13-cv-22416, 2015 WL 5795867 *9 (S.D. W. Va. Sept. 30, 2015) (inadequacy of allegations involving supervisory liability claim based upon denial of grievances); *see also Larson v.* Meek, 240 F. App'x 777, 780 (10th Cir. 2007); *Ferris v. Jones*, No. 4:14-cv-454, 2015 WL 4668297, at *9 (N.D. Fla. Aug. 5, 2015). Thus, Cantrell's allegations concerning Rubenstein's supervisory liability are largely conclusory, speculative and unsupported by the record.

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact concerning their liability and that defendant Rubenstein is entitled to judgment as a matter of law on all of Cantrell's claims against him.

To the extent that Cantrell has also asserted that defendant Hahn should be held liable as a supervisor for the training of officers to use chemical agents on compliant inmates, Hahn is also deemed to have admitted that, at the time of Cantrell's incidents, correctional officers were instructed not to temper the severity of force used on inmates in the segregation units and that the term "Marshal [sic; Martial] Law" was being used by staff as a condition being utilized on the Quilliams units at MOCC.  However, beyond his training certificate as an "OC Aerosol Instructor," there is no evidence of record to demonstrate any specific facts concerning his training of subordinate officers.   The training records provided by both Cantrell and the defendants do not indicate that Hahn was the instructor in any of their classes concerning the use of chemical agents. (ECF No. 96, Ex. B; ECF No. 98, Ex. H).  Moreover, there is absolutely no evidence of record

concerning the content of the training sessions.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and that defendant Hahn is entitled to judgment as a matter of law on Cantrell's supervisory liability claim against him.[17]

### D.    Qualified immunity.

The defendants' Motion and Memorandum of Law further argue that the defendants are entitled to qualified immunity on all of the plaintiff's claims.  As noted in the defendants' Memorandum:

> Qualified immunity shields executive officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine affords correctional officers "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  It insulates them from "bad guesses in gray areas," ensuring that they are only liable "for transgressing bright lines." *Maciarello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993).  "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Hunter*, 502 U.S. at 229.  "Where there is a legitimate question as to whether the officer's conduct would objectively violate the plaintiff's right, qualified immunity 'gives [correctional] officers the necessary latitude to pursue their [duties] without having to anticipate, on the pain of civil liability, future refinements or clarification of constitutional law.'" *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (alteration in *Slattery*).

(ECF No. 97 at 5-6).  The defendants further assert that "[a] [correctional] officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information **could** have believed that his conduct was lawful." *Slattery*, 939 F.2d at 216.

---

[17]  However, because the undersigned previously proposed that the presiding District Judge deny summary judgment with respect to Cantrell's claims against defendant Hahn with respect to Cantrell's placement in the restraint chair, the undersigned cannot recommend the complete dismissal of Hahn as a defendant herein.

(*Id.* at 6).   They further note that "[t]he calculus of reasonableness must embody allowances for the fact that [correctional] officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation." *Park v. Shiflett*, 250 F.3d 843, 853 (4th Cir. 2001).   (*Id.* at 7).

In ruling on an issue of qualified immunity, a court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   If the allegations do not give rise to a constitutional violation, no further inquiry is necessary.   *Id.*   If, on the other hand, a violation can be shown, then the court must determine whether the right was clearly established in the specific context of the case.   *Id.*

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that courts may decide to address whether the right is clearly established first.   The *Pearson* Court noted that the doctrine of qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."   555 U.S. at 230.   Here, the defendants assert that they are entitled to qualified immunity because Cantrell has failed to proffer sufficient evidence to demonstrate the violation of any clearly-established constitutional right.

However, as previously addressed herein, the evidence presented, taken in the light most favorable to Cantrell, leaves genuine issues of material fact concerning whether the use of chemical agents against Cantrell and later placing him in a restraint chair, allegedly without permitting him an opportunity to use the restroom, were excessive uses of force

54

under the Eighth Amendment.  There is clearly-established authority that would have placed defendants Plumley, Miller, Embrescia, Rhodes, Hahn on notice that the use of such force under the circumstances as presented by Cantrell could be construed as unconstitutional.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that defendants Plumley, Miller, Embrescia, Rhodes and Hahn are not entitled to qualified immunity and judgment as a matter of law on Cantrell's Eighth Amendment claims.

Additionally, because there are genuine issues of fact as to whether defendants Ballard and Frame have authorized the unconstitutional and excessive use of force on the segregation units at MOCC, the undersigned proposes that the presiding District Judge **FIND** that those defendants are not entitled to qualified immunity on Cantrell's claims against them.  However, the undersigned further proposes that the presiding District Judge **FIND** that, because Cantrell has not established any violation of his rights by defendant Rubenstein, he is entitled to qualified immunity and judgment as a matter of law.

### RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the defendants' Motion for Summary Judgment (ECF No. 96) with respect to the supervisory liability claim against defendants Rubenstein and Hahn, and the failure to intervene claim against defendant Miller concerning the restraint chair.  It is further respectfully **RECOMMENDED** that the presiding District Judge **DENY** the defendants' Motion for Summary Judgment (ECF No. 96) with respect to all of the claims against defendants Plumley, Embrescia, Rhodes and Ballard and the remaining claims against defendant Miller and Frame.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the district court and a waiver of appellate review by the circuit court of appeals.  *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy to the plaintiff and to transmit a copy to counsel of record.

 August 23, 2016

Dwane L. Tinsley
United States Magistrate Judge